**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Reynaldo V. Magbual,** **Civil No. 01-157 (JMR/SRN)**

**Plaintiff,**

v.

**REPORT AND RECOMMENDATION**

**Corrections Corporation of America; Hoyt Brill, Warden; John Riches II; Nurse K. Debuhr; Nurse K. James; Dr. Kim H. Tatsumi; Dr. Platz; Dr. Somkiat Viratyosin; Emergency Medical Services Association; Patty Swenson;**

**Defendants.**

---

Paul A. Sortland, Esq., on behalf of Plaintiff.

Martha K. Sieber, Esq., on behalf of Defendants Debuhr, James, and Emergency Medical Services Association.

Cecilie Morris Loidolt, Esq., on behalf of Defendants Viratyosin and Tatsumi.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on June 3, 2002, on Defendants Tatsumi and Viratyosin's Motion for Summary Judgment (Doc. No. 59), and on September 13, 2002, on Defendants Debuhr, James, and Emergency Medical Service's Motion for Summary Judgment (Doc. No. 76).[1] These motions have been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c). For the

[1]Plaintiff's counsel's motion to withdraw and Plaintiff's motion for appointment of counsel will be addressed in a separate Order.

NOV - 4 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

reasons set forth below, the Court recommends that Defendants' motions be granted.

## I. FACTUAL BACKGROUND

In the present case, Plaintiff has brought claims for medical malpractice, negligent infliction of emotional distress, and deprivation of constitutional and statutory rights (First Amended Complaint (Complaint).)

### A. Plaintiff's Injury and Treatment.

At all times pertinent to the above claims, Plaintiff was located at the Prairie Correctional Facility in Appleton, Minnesota (PCF). (Complaint ¶ 1.) PCF is operated by Corrections Corporation of America (CCA), a Maryland corporation. Id. at ¶ 2. Defendant Emergency Medical Services Association (EMSA) is a Florida corporation which contracted to provide medical services within the prison facility during the time in question. Id. at ¶ 3. Defendants Debuhr and James are nurses employed at PCF. Id. at ¶ 5. Defendant Platz is a medical doctor hired to work at PCF during the time in question. Id. at ¶ 6. Defendants Tatsumi and Viratyosin are medical doctors who were employed to provide medical care to PCF inmates during the time in question. Id. at ¶ 9.

On or about April 23, 1999, while Plaintiff was incarcerated at PCF, a conveyor fell causing a "crush" type of injury to his right hand and index finger. Id. at ¶ 11. An initial examination was immediately performed, but no further medical care was provided. Id. at ¶ 12. After one week with no improvement, Plaintiff requested an X-ray of his hand, and that he be seen by a medical doctor. Id. at ¶ 13. An X-ray was ordered at the time, but not completed for another week. Id. Plaintiff states that Platz interpreted the X-rays erroneously as "cleared." Id. A splint was then applied. Id. Over the next several months, the condition of Plaintiff's hand

and index finger deteriorated, and he experienced pain, swelling, and decreased range of motion. Id. at ¶ 14. Doctors and nursing staff documented this deterioration. Id. at ¶ 15. On June 25, 1999, two months after the injury, Viratyosin, an orthopedic physician, was consulted. Id. at ¶ 16. By this time, Plaintiff had developed a large hematoma or possible abscess of his right hand, and a boutonniere on his right index finger. Id. Viratyosin indicated he could not rule out an underlying infection and recommended a bone scan of Plaintiff's hand, particularly if he continued to experience problems. Id. at ¶ 17. Viratyosin also recommended physical therapy to regain the range of flexion in his joints. Id. The bone scan, however, was never ordered, and physical therapy was never initiated. Id. at ¶ 18. On July 10, 1999, Plaintiff saw Viratyosin again, and he again recommended physical therapy. Id. at ¶ 19. Such therapy was not available at PCF, and on July 16, 1999, Hawaiian authorities granted approval for therapy. Id. at ¶¶ 19-20. Plaintiff never received this therapy. Id. at ¶ 20. Plaintiff's hand and finger continued to deteriorate. Id. at ¶ 21. In September 1999, Tatsumi reexamined the hand and ordered Plaintiff to see a hand specialist because he had developed contractures. Id. Despite Tatsumi's order, the hand specialist appointment was not made until October 21, 1999. Id. at ¶ 22. The hand specialist diagnosed Plaintiff with "a well healed metacarpal fracture and disruption of the central slip of the extensor digitorium communis to index finger," and recommended surgery. Id. at ¶ 23. Plaintiff requested a second opinion to determine if surgery would relieve the pain in his hand and finger. Id. at ¶ 24. A second opinion was not arranged, however, for another five months. Id. The second hand specialist recommended amputation of Plaintiff's right index finger. Id. at ¶ 25. On May 25, 2000, thirteen months after the initial injury, Plaintiff's right index finger was amputated at Methodist Hospital in St. Louis Park, Minnesota. Id. at ¶ 26.

Plaintiff states that although his pain has now decreased, it continues to debilitate him. Id.

**B. Plaintiff's Experts.**

**1. Nurse Pamela Velner.**

Velner's expert report[2] recounts the events listed above. It adds that on June 25, 1999, the hematoma required drainage. Plaintiff's hand and finger continued to deteriorate because the bone scan was never performed and the physical therapy was never initiated. And at the July 10, 1999 appointment, Viratyosin felt the risk of infection was low.

Velner opines that Defendants deviated from the standard for medical care in the following ways:

**Failure to refer.**

Velner states that Defendants failed to refer Plaintiff to a medical doctor when signs and symptoms indicated referral was appropriate. She explains that decreased range of motion with swelling in an extremity indicates the need for a medical doctor's assessment. These symptoms were noted on the initial exam performed by the registered nurse, but Plaintiff was not referred to a doctor until the following week, when he presented worsening symptoms.

**Failure to treat in a timely fashion.**

Velner states an X-ray was ordered on April 30, 1999 and again on May 3, 1999, but request for approval was not faxed to Hawaii until May 6, 1999. When the X-ray was finally taken on May 7, 1999, it was two weeks after the injury. She also states that PCF staff determined that Plaintiff's hand and finger required emergency care by an orthopedic doctor on

[2] All of the details of Velner's opinion are contained in the February 15, 2002 Affidavit of Expert Review By Pamela Velner.

June 2, 1999, but he was not seen by the doctor until June 25, 1999. She explains that "according to Wheeless' Textbook of Orthopaedics, infectious tenosynovitis is a true orthopaedic emergency and in most cases immediate drainage in the OR is required." Nevertheless, it was 23 days before Viratyosin examined Plaintiff. It also took an additional three months before Plaintiff was presented to a hand specialist. Velner observes that this actually took place six months after Plaintiff's injury. She states that according to the American Academy of Orthopaedic Surgeons, "when treating a patient with ligamentous injuries or tendinitis, if the patient responds partially or poorly after two weeks of treatment, then referral to a specialist is recommended." Velner also observes that Plaintiff did not receive the second opinion he requested for five months, and the final surgery did not take place until 13 months after the injury.

**Failure to treat properly.**

Velner explains that no non-steroidal anti-inflammatory medications were ordered until two weeks after the injury. The July 10, 1999 order for occupational therapy was never initiated, nor was the July 24, 1999 order. Velner states that Plaintiff's contractures were due to the lack occupational therapy, and that according to Wheeless' Textbook of Orthopaedics, occupational and physical therapy are extremely important to patient outcome success. Further, she states that very specific methods of splinting are required depending on each injury, and patients must be carefully monitored. According to Velner, in the present case, the documentation on splinting methods was vague. In addition, on October 21, 1999, the hand specialist requested that a physical therapist apply a particular splint, "made for his boutonniere deformity to keep it from progressing and to keep flexible." But because Plaintiff was never seen by a physical therapist,

he never received the specialized splint. Finally, twelve days after the amputation, the surgeon ordered post surgical therapy which Plaintiff also never received.

**Failure to diagnose.**

Velner lists the following untimely, incorrect, and occasionally contradictory diagnoses: On April 30, 1999, Plaintiff was diagnosed with a possible small fracture. On May 7, 1999, a doctor prescribed antibiotics for five days without a documented rationale or diagnosis. On June 1, 1999, Plaintiff was diagnosed with "fracture of carpanavicular bone of the right hand, very large non-resolving hematoma and right hand dorsal metacarpal compartment with extensor tendon compression." On June 24, 1999, the diagnosis was changed to a possible infection in the deeper spaces of the hand, and a fracture was ruled out. Velner stresses that it took two months to rule out a fracture. On June 25, 1999, the diagnosis was changed to "probable extensor tendon tenosynovitis status post partial treatment of periostitis and also stiffness at metacarpophalangeal joint thumb and index finger."

On October 21, 1999, the hand specialist indicated that the X-rays from May 1999 indicated a metacarpal fracture. Velner observes that a fracture had been ruled out in June 1999. She notes that according to Wheeless' Textbook of Orthopaedics, if this type of fracture and disruption of the central slip are not aggressively treated with proper splinting and therapy, they can lead to boutonniere formation as a complication. On October 21, 1999, the diagnosis was also changed to extensor tendon rupture, right index finger, hematoma, possible infection dorsum right hand. On March 13, 2000, Plaintiff's hand and finger were diagnosed as chronic arthrofibrosis metacarpophalangeal joint right index finger, rigid boutonniere deformity. And on the day of the amputation, Plaintiff was diagnosed with rigid boutonniere deformity and chronic

infection right index finger.

**Failure to act on communication received.**

Velner explains that the recommended physical therapy was ordered but never acted upon by PCF staff, nor was the recommended bone scan ever performed. Two and a half months after the surgery, Plaintiff continued to complain of pain and numbness. His surgeon recommended an EMG to rule out any neurologic abnormalities, but this was never performed.

**Failure to perform appropriate and diagnostic tests.**

On May 7, 1999, Plaintiff's radiologist recommended an additional view of the wrist to rule out a fracture. This was not ordered until June 22, 1999. On June 22 and June 25, 1999, the radiologist recommended a bone scan that was never performed.

**Conclusion.**

Velner states, "[i]n summary, Mr. Magbual suffered emotionally and physically as a result of the negligent acts and time delays in his care. All opinions are stated at least to a degree of reasonable medical certainty. In addition to the disfigurement, Mr. Magbual has suffered emotional distress, mental anguish, functionally, physical pain and loss of wages."

**2. Dr. Paul Warshawsky.**

Warshawsky's expert report[3] contains many of the same facts contained in the Amended Complaint that were recorded above. His report includes many of Velner's observations and also includes the following observations:

A progress note from shortly after the accident indicates Plaintiff's hand was edematous

---

[3]All of these facts are taken from the February 14, 2002 Affidavit of Expert Review By Dr. Paul Warshawsky.

at the first knuckle with limited range of motion, but the care provider found there was no gross abnormality and instructed Plaintiff to use ice. On April 28, 1999, Plaintiff requested further medical care, pointing out that there was swelling and he could not close his knuckle. On May 7, 2000, Platz indicated that the hand had worsened while waiting for an X-ray. On June 24, 1999, PCF notes record that X-rays demonstrated abnormalities of the carpanavicular bone. On June 25, 1999, after performing an exploratory procedure and draining the abscess, Viratyosin wrote that there was clearly significant periostitis, but he did not detect any spread of the infection along the lumbrical muscle, and there was no spread of abscess along the extensor tendon. Viratyosin stated he did not see the need for long-term intravenous antibiotics, but Plaintiff should be encouraged to move his fingers and might benefit from physical or occupational therapy. He believed the stiffness was due to prolonged swelling and pain.

On July 10, 1999, Viratyosin wrote that he was concerned about deep infection in the hand. At that time he still failed to properly diagnose the boutonniere deformity, and wrote that the cause of the problem was most likely due to the chronic repetitive injury. Warshawsky states that Viratyosin wrote misleadingly that "it was uncertain whether it was self-inflicted or not." On July 14, 1999, when Plaintiff was seen by Tatsumi, he was experiencing pain and right arm numbness. Warshawsky states that "unfortunately, the health care providers at PCF, including the outside care providers, Tatsumi and Viratyosin, and the internal staff, such as the nurses, failed to properly detect or treat the boutonniere deformity that Mr. Magbual had incurred." On October 21, 1999, Dr. Benjamin Levine, a physician associated with the Park Nicollet Clinic, first correctly diagnosed Plaintiff with a boutonniere deformity. Levine prescribed physical therapy and a splint for the boutonniere deformity to keep it flexible and prevent it from

progressing.

"Surgery was scheduled. However as late as December 7 1999, it was noted that no action had been taken with regard to having a surgery scheduled and that Magbual, as a result, was still suffering significant pain. This is noted again on December 15, 1999." On March 13, 2000, Plaintiff was diagnosed with rigid boutonniere deformity, and partial amputation was recommended. The surgery was initially denied by PCF on the grounds that it was not medically necessary. But on May 25, 2000, the surgery was performed by another physician at the Park Nicollet Clinic. Warshawsky notes that Plaintiff still suffers pain, and "[b]ecause of the delay in proper diagnosis, and circumstances of Mr. Magbual's care, it is likely that this pain will continue."

Warshawsky opines that Defendants deviated from the standard for medical care in the following ways:

**Failure to refer.**

EMSA Correctional Care repeatedly failed to refer Plaintiff to a medical doctor when his decreased range of motion and swelling indicated a medical doctor's assessment was necessary.

**Failure to treat and diagnose.**

An X-ray was ordered On April 30, 1999, and again on May 3, 1999, but the request for approval was not faxed to Hawaii until May 6, 1999, and the X-ray was not taken until May 7, 1999. On June 2, 1999, PCF staff finally recognized that Plaintiff's hand required emergency care from an orthopedic doctor because of his infectious tenosynovitis, but Plaintiff was not seen by an orthopedic doctor until June 25, 1999. "When treating patients with ligamentous injuries or tendinitis, if the patient responds partially or poorly after two, and sometimes earlier, weeks of

treatment, then referral to a specialist is recommended." Plaintiff did not see a specialist, however, until six months after his injury. Plaintiff was not provided with a second opinion until five months after his request.

Non-steroidal inflammatory medications should have been considered earlier than two weeks after the injury. Physical therapy is important to a patient's success. Due to the lack of occupational therapy, Plaintiff's September 22, 1999 examination indicated he had developed contractures and disuse of his index finger. Documentation of splinting methods was vague. Plaintiff also never received the requested specialized splint. Plaintiff received eight different diagnoses from the date of his injury until the amputation. Warshawsky states this was a failure to diagnose on the part of all the health care providers until Plaintiff was finally referred to the Park Nicollet Clinic.

Warshawsky makes the following arguments concerning causation:

> 45. The failure to properly treat and provide this appropriate therapy and splinting directly led to the boutonniere deformity and increased pain. The lack of splinting and therapy link to the boutonniere deformity. The crush type of injury that Mr. Magbual suffered to his right hand and index (2nd) finger on April 23, 1999, required emergent evaluation by an orthopedic specialist on the same date. In Mr. Magbual's case immediately upon the injury occurring there is damage to the structures of the area involved. This occurs at the cellular level. It is manifested by swelling (inflammation), both micro- and macroscopically in addition to pain caused by injury to the nerves innervating the involved area. Subsequently, infection, ulceration, persistent (or additional) swelling and pain occur in improperly diagnosed and treated injuries. In addition, tenosynovitis, periostitis, hematoma, compression, fibrosis and infection can contribute to contractures (boutonniere deformity). Mr. Magbual's injury of April 23, 1999 is causally related to the aforementioned mentioned [sic] complications described in this Item 45.
>
> 56. Had the correct diagnosis been made, of the metacarpal

> fracture and disruption of the central slip of the extensor digitorium, proper therapy and splinting would have been provided, to a reasonable degree of medical certainty, complications, including the boutonniere deformity would not have developed. This is because much of the injury at the micro- and macroscopic levels is reversible when diagnosed and treated properly and in a timely manner.
>
> 57. It was the failure on the part of EMSA Correctional Care, those associated with it, and the local doctors treating Reynaldo Magbual to act upon the communication they received. This was a deviation from the standard of care which required prompt actions on such communications.
>
> 60. It is my opinion, as a medical doctor that there were a number of these deviations from the standard of care that one would have expected, even in a medical facility. Prompt and proper diagnosis of the metacarpal fracture and the treatment of the tendon and fracture problems suffered by Mr. Magbual would have, to a degree of reasonable medical certainty, prevented the boutonniere deformity from developing. As a result, Mr. Magbual would not have continued to suffer his severe and debilitating pain. Mr. Magbual would not have then made the reasonable choice, as recommended by at least one of his doctors, to amputate the finger in an effort to alleviate the pain. Had the prompt diagnosis and treatment taken place, as indicated by the standard of care, the continuing pain and suffering that Mr. Magbual has today [would], to a degree of reasonable medical certainly, have been avoided or of a lesser degree.
>
> 61. As a result of the negligence of the defendants in this action, Mr. Magbual, in my opinion, suffers distress, disfigurement, and physical pain. He will continue to suffer this physical pain, more likely than not, throughout the rest of his life unless additional treatment is successfully provided.

## II. DISCUSSION

### A. <u>Procedural Standard.</u>

Summary Judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "Once the moving party shows that there are no material issues of fact in dispute, the burden shifts to the nonmoving party to set forth facts showing that there is a genuine issue for trial." Donovan v. Harrah's Maryland Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002) citing Celotex, 477 U.S. at 323. "In opposing a motion for summary judgment, the nonmovant must make a showing that, if reduced to admissible evidence, would be sufficient to carry the nonmovant's burden of proof at trial." Celotex, 477 U.S. at 323

> We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

Celotex, 477 U.S. at 324.

**B. Substantive Standard.**

**1. Negligent infliction of emotional distress.**

> In tort cases, emotional distress may be an element of damages in only three circumstances. First, a plaintiff who suffers a physical injury as a result of another's negligence may recover for the accompanying mental anguish. *Langeland v. Farmers State Bank*

> *of Trimont*, 319 N.W.2d 26, 31 (Minn. 1982). Second, a plaintiff may recover for negligent infliction of emotional distress when physical symptoms arise after and because of emotional distress if the plaintiff was actually exposed to the physical harm as a result of the negligence of another (the "zone-of-danger" rule). *K.A.C. v, Benson*, 527 N.W.2d at 559; Langeland, 319 N.W.2d at 31; *Stadler v. Cross*, 295 N.W.2d 552, 554 (Minn. 1980). Finally, a plaintiff may recover emotional distress damages when there has been a "direct invasion of the plaintiff's rights such as that constituting slander, libel, malicious prosecution, seduction, or other like willful, wanton, or malicious conduct." *State Farm Mut. Auto Ins. Co. v. Village of Isle*, 265 Minn. 360, 368, 122 N.W.2d 36, 41 (1963). *See also*, *M. H. v. Caritas Family Services*, 488 N.W.2d 282, 290 (Minn. 1992); *Hubbard*, 330 N.W.2d at 437-38; *Langeland*, 319 N.W.2d at 31-32.

Lickteig v. Alderson, Ondov, Leonard, 556 N.W.2d 557, 560 (Minn. 1996).

**2. Medical Malpractice.**

> **Subd. 2. Requirement.** In an action alleging malpractice, error, mistake, or failure to cure, whether based on contract or tort, against a health care provider which includes a cause of action as to which expert testimony is necessary to establish a prima facie case, the plaintiff must: (1) unless otherwise provided in subdivision 3, paragraph (b), serve upon defendant with the summons and complaint an affidavit as provided in subdivision 3; and (2) serve upon defendant within 180 days after commencement of the suit an affidavit as provided by subdivision 4.
>
> **Subd. 3. Affidavit of expert review.** The affidavit required by subdivision 2, clause (1), must be by the plaintiff's attorney and state that:
>
> (a) the facts of the case have been reviewed by the plaintiff's attorney with an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial and that, in the opinion of this expert, one or more defendants deviated from the applicable standard of care and by that action caused injury to the plaintiff; or
>
> (b) the expert review required by paragraph (a) could not reasonably be obtained before the action was commenced because of the applicable statute of limitations. If an affidavit is executed

> pursuant to this paragraph, the affidavit in paragraph (a) must be served on defendant or the defendant's counsel within 90 days after service of the summons and complaint.
>
> **Subd. 5. Responsibility of plaintiff as attorney.** If the plaintiff is acting pro se, the plaintiff shall sign the affidavit or answers to interrogatories referred to in this section and is bound by those provisions as if represented by an attorney.
>
> **Subd. 6. Penalty for noncompliance.**[4] Failure to comply with subdivision 2, clause (1), within 60 days after demand for the affidavit results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case.
>
> Failure to comply with subdivision 2, clause (2), and subdivision 4 results, upon motion, in mandatory dismissal with prejudice of each cause of action as to which expert testimony is necessary to establish a prima facie case.

Minn. Stat. § 145.682 (2002). "The Minnesota legislature enacted Minn. Stat. § 145.682 for the purpose of eliminating nuisance medical malpractice lawsuits by requiring plaintiffs to file affidavits verifying that their allegations of malpractice are well founded." Stroud v. Hennepin County Medical Center, 556 N.W.2d 552, 555 (Minn. 1996).

Courts have approached § 145.682's noncompliance provision as follows:

> There are two methods through which a plaintiff may escape dismissal for noncompliance. First, the court may extend the time for serving the affidavits, even after the time limits have expired, upon a showing of excusable neglect. Stern v. Dill, 442 N.W.2d 322, 324 (Minn.1989). To claim excusable neglect, Minnesota courts require a plaintiff to satisfy four factors: (1) plaintiff has a reasonable case on the merits; (2) plaintiff has a reasonable excuse for his failure to meet the statutory time limits; (3) plaintiff has proceeded with due diligence after notice of statutory time limits;

---

[4]Subdivision 6 has since been amended. The amendment, however, applies only to causes of action commenced on or after final enactment. See Laws of Minnesota for 2002, Chapter 403–H.F.No. 2780. Consequently, it does not apply to the present case.

> and (4) no substantial prejudice will result to defendant by the extension of time. *See Parker v. O'Phelan*, 414 N.W.2d 534, 537 (Minn.Ct.App.1987), *aff'd by equally divided court*, 428 N.W.2d 361 (Minn.1988).
>
> Second, a plaintiff need not submit expert affidavits if liability may be established without expert testimony. Minnesota courts hold that "[e]xpert testimony is not necessary where the facts to be determined are within the common knowledge of the jury and where the results of surgical or medical treatment, viewed in the light of all the circumstances, provide a sufficient evidentiary basis to support an inference of negligence." *Bauer v. Friedland*, 394 N.W.2d 549, 553 (Minn.Ct.App.1986); *see also Sorenson v. St. Paul Ramsey Medical Ctr.*, 457 N.W.2d 188, 191 (Minn.1990).

Bellecourt v. United States, 784 F. Supp. 623, 636-37 (D. Minn. 1992).

Minnesota courts have analyzed the adequacy of § 145.682 affidavits as follows:

> The purpose of expert testimony is to interpret the facts and connect the facts to conduct which constitutes malpractice and causation. Thus, to satisfy the requirements of the second affidavit, it is not enough simply to repeat the facts in the hospital or clinic record. The affidavit should set out how the expert will use those facts to arrive at opinions of malpractice and causation. To state, as was done in this case, that the expert will testify that the defendants "failed to properly evaluate" and "failed to properly diagnose" is not enough. These are empty conclusions which, unless shown how they follow from the facts, can mask a frivolous claim.

Sorenson v. St. Paul Ramsey Med. Ctr., 457 N.W.2d 188, 192-93 (Minn. 1990).

> We noted that in cases commencing after the filing of the *Sorenson* opinion, plaintiffs would be expected to set forth, by affidavit or answers to interrogatories, specific details concerning their experts' expected testimony, including the applicable standard of care, the acts or omissions which the plaintiff alleges resulted in a violation of the standard of care, and an outline of the chain of causation between the violation of the standard of care and the plaintiff's damages.

Stroud, 556 N.W.2d at 555-56.

### 3. Deprivation of constitutional and statutory rights.

"By the plain terms of § 1983, two–and only two–allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." Gomez v. Toledo, 446 U.S. 635, 640 (1980). "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993).

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983. . . .
>
> an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

Estelle v. Gamble, 429 U.S. 97, 104-07 (1976) (internal citation omitted).

To succeed on an Eighth Amendment claim of delay in providing medical treatment, a plaintiff must establish that: (1) the harm allegedly done is "objectively, sufficiently serious," and (2) the prison official was "as a subjective state of mind, deliberately indifferent to the prisoner's condition." Reece, 60 F.3d at 491. "An inmate who complains that delay in medical treatment

rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill v. Reg'l Youth Det. Ctr. 40 F.3d 1176, 1188 (11th Cir. 1994).

> Although "State action," for Section 1983 purposes, is ordinarily committed by officers and employees of a State governmental agency, Courts have, nonetheless, found that private parties can commit "State action." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The test employed, in determining whether a private citizen's conduct constitutes "State action," is one of ascertaining whether the private citizen's conduct can be "fairly attributable to the State." *Id.*

Steele v. City of Bemidji, 114 F. Supp.2d 838, 845-46 (D. Minn. 2000) (reversed in part on other grounds). In Segler v. Clark County, 142 F. Supp.2d 1264 (D. Nev. 2001), a court held that a private company contracted to provide medical care for inmates at a county detention center qualified as a state actor for § 1983 purposes.

### C. Defendants Viratyosin and Tatsumi's Motion for Summary Judgment.

#### 1. Medical malpractice.

Defendants explain that Plaintiff failed to file the first affidavit of expert review along with his summons and complaint. Consequently, they argue, the complaint should be dismissed with prejudice.

Defendants also argue that neither of Plaintiff's expert affidavits provide the required chain of causation between their conduct and Plaintiff's complications from the original injury. Consequently, they maintain the affidavits fail to meet the substantive requirements of Minn. Stat. § 145.682, and the claim should be dismissed pursuant to subdivision 6. Defendants state that the failure to demonstrate causation also entitles them to summary judgment.

Defendants assert that Warshawsky's affidavit is largely conclusory and, therefore,

insufficient. The few arguments that are contained in the affidavit, according to Defendants, do not apply to their conduct. They state that paragraph 45 concerns splinting and emergency care. They explain that they were never in a position to provide such emergency care, because neither was involved in Plaintiff's care until over two months after the initial injury. Defendants make the same argument concerning paragraph 56, which also concerns initial diagnoses and splinting therapy.

Paragraph 57 does mention local doctors, but Defendants argue that it merely discusses a deviation from the standard of care, and does not discuss a chain of causation. Finally, paragraph 18 acknowledges that Tatsumi referred Plaintiff to a hand specialist. Paragraph 58 also acknowledges that Viratyosin recommended occupational therapy, and it was the PCF staff that failed to act on this recommendation. Hence, the paragraphs actually pertaining to Defendants do not demonstrate they deviated from the standard of care.

Defendants argue that Velner's affidavit is also insufficient. They state that it merely repeats facts from the medical records. The affidavit then alleges the same deviations from the standard of care against all the Defendants generally, and never mentions Viratyosin or Tatsumi by name. Defendants explain that "her series of accusations does not and cannot connect Dr. Viratyosin or Dr. Tatsumi with Magbual's injury. To state, as was done in this case, that the expert will testify that the defendants 'failed to properly evaluate' and 'failed to properly diagnose' is not enough."

Defendants add that they informed Plaintiffs' counsel that Warshawsky's affidavit lacked the specificity required by Minn. Stat. § 145.682, but received no supplementation or response. Consequently, under precedent such as Stroud, they maintain the claim should be dismissed. In

addition, Defendants argue Plaintiff should not be granted an extension to supplement his affidavits. Citing Bellecourt, Defendants conclude, "[e]xcusable neglect is properly requested when a plaintiff fails to meet the deadline; its purpose is not to frivolously delay litigation after submitting inadequate expert affidavits."

Plaintiff responds that the expert affidavits are sufficiently detailed under Minnesota law. He explains that the affidavits provide an analysis of the standard of care, the acts or omissions he alleges resulted in a violation of the standard of care, and a specific outline of the chain of causation. Consequently, Plaintiff argues the affidavits satisfy the requirements of Stroud. Plaintiff explains that paragraph 36 of Warshawsky's affidavit included Viratyosin and Tatsumi in the list of doctors who failed to timely diagnose or refer. Plaintiff states that paragraphs 45 and 51-57 provide causation. In addition, Plaintiff emphasizes that paragraph 57 includes local doctors.

Plaintiff notes that in Swierkiewicz v. Sorema, N.A., 534 U.S. 506 (2002), the Supreme Court determined that plaintiffs in an employment discrimination case are not required to plead facts to make a prima facie case in their initial complaints. Plaintiff also cites Ellefson v. Earnshaw, 499 N.W.2d 112 (N.D. 1993), in opposing the Defendants' motion for summary judgment. Plaintiff states that in Ellefson, the North Dakota Supreme Court interpreted a North Dakota statute and determined that "the statute does not require that the expert opinion be sufficient to sustain a directed verdict, or that the matter be tried in the context of the motion to dismiss the action under the statute." Plaintiff states the same analysis should apply in Minnesota. Alternatively, Plaintiff requests the opportunity to submit additional affidavit testimony if the Court finds the current affidavits are deficient.

Plaintiff also argues that if his affidavits are insufficient under Minn. Stat. § 145.682, the statute must then be unconstitutional. He explains that "to arbitrarily dismiss causes of action for minor irregularities is not constitutional under Minnesota or United States law." Plaintiff stresses that by not providing the opportunity to amend the affidavits, the statute harshly penalizes parties for inadvertent mistakes made by their attorneys. He explains that other Minnesota statutes also require expert affidavits, but allow for supplementation and amendment.

Plaintiff explains that Sorenson did not establish a bright-line determination of what constitutes sufficient detail. In Sorenson, the court stated "[i]n borderline cases where counsel for a plaintiff identifies the experts who will testify and give some meaningful disclosure of what the testimony will be, there may be less drastic alternatives to a procedural dismissal." 457 N.W.2d at 193. Plaintiff states that since Sorenson, courts have ignored this caution against harsh sanctions.

Plaintiff also argues that § 145.682 as interpreted in recent decisions is unconstitutional, because it requires courts to assume facts against the non-moving party rather than in its favor. This practice contradicts the normal summary judgment standard by which courts are required to review the evidence in the light most favorable to the non-moving party.

**2. Deprivation of constitutional and statutory rights.**

Defendants argue that the allegations in the Complaint do not give rise to claims for deprivation of constitutional and statutory rights. Defendants state that the Complaint does not allege deliberate indifference, and the expert affidavits are based in negligence rather than deliberate indifference. Defendants quote Bellecourt's statement that "[m]ere negligence, inadvertent failure to provide adequate medical care and gross negligence do not support a claim

of medical mistreatment under the eighth amendment." 784 F. Supp. at 634. Defendants state that Plaintiff has merely alleged a standard case of medical malpractice and failed to show he was deprived of a federal right. Thus, Defendants argue Plaintiff failed to satisfy the first element from Gomez.

In addition, Defendants assert that "Magbual fails to allege anywhere in either the original or Amended Complaint that either physician acted under color of state law." Thus, Plaintiff fails to satisfy the second element from Gomez. Consequently, Defendants maintain the claim must be dismissed.

Plaintiff responds that he can assert a § 1983 action against doctors in private practice.[5] He explains the Supreme Court has held that deliberate indifference to the needs of prisoners constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. Plaintiff cites Reece v. Grose, 60 F.3d 487 (8th Cir. 1995), a case concerning prison officials' alleged delay of medical treatment, in support of his claim. He states that in Reece, the Eighth Circuit found that a question of fact existed, and the plaintiff had submitted sufficient evidence to go to trial.

With respect to the issue of state action, Plaintiff explains that in Segler, a court determined that a private healthcare provider that provided medical services to prisoners qualified as a state actor. In Richardson v. McKnight, 521 U.S. 399 (1997), the Supreme Court found prison guards employed by a private corporation contracted to manage a correctional

---

[5]In his memorandum, Plaintiff states "42 U.S.C. §§ 1985 and 1986 are not necessary to Magbual's claims. These will be voluntarily dismissed." Consequently, the Court has omitted Defendants' argument concerning §§ 1985 & 1986, and will not discuss them in its Recommendation.

facility were not entitled to qualified immunity from a § 1983 action. And in Krueger v. Jenne, 164 F. Supp.2d 1330 (S.D. Fla. 2000), a § 1983 action against a private healthcare provider, the court held that delay in treatment constituted deliberate indifference subjecting the defendant to liability.

**3. Negligent infliction of emotional distress.**

Defendants argue that this claim must be dismissed as a matter of law because it can not satisfy any of the three circumstances listed in Lickteig. Defendants explain that in the Amended Complaint, Plaintiff never identifies any emotional distress symptoms. Consequently, Plaintiff can not argue he suffers physical symptoms which arose because of emotional distress. In addition, there are no facts alleged in the Amended Complaint suggesting Plaintiff was exposed to grave personal danger. Consequently, Defendants state he can not satisfy the "zone-of-danger" requirement. Finally, Defendants state Plaintiff has not alleged conduct constituting a direct invasion of his rights such as slander, libel, malicious prosecution, or any like willful, wanton, or malicious conduct. Consequently, Defendants argue Plaintiff can not satisfy the third circumstance either. As a result, they conclude summary judgment must be granted.

Plaintiff responds that he does allege that he suffered a direct invasion of his rights as stated in the § 1983 action. Consequently, he argues he is entitled to pursue an action for negligent infliction of emotional distress.

**D. Defendants Debuhr, James, and Emergency Medical Service's Motion for Summary Judgment.**

**1. Medical malpractice.**

Defendants argue that Plaintiff's experts have failed to properly delineate the standard of care governing nurses, and failed to outline the chain of causation between their conduct and the

resulting injuries. Defendants explain that Velner does not differentiate between acts committed by physicians and acts committed by nurses. They agree that nurses "are required to record their observations and to refer the patient to a physician if the situation warrants it." Consequently, Defendants concede that faulting the nurses for failing to refer Plaintiff to a physician when he presented to the clinic with decreased range of motion and swelling, "is one instance where Nurse Velner has properly identified the standard of care governing nurses."

In all other instances, however Defendants state that by not setting out the standard of care, Velner is blaming the nurses for medical decisions. They contend that Velner's claim of "failure to treat in a timely fashion when signs and symptoms of a deteriorating condition are evident" is based on her opinion that it took too long to get an X-ray. According to Defendants, ordering diagnostic tests such as X-rays is a physician's function rather than a nurse's. As a result, this failure can not be a criticism of the nurses. They make the same argument for failing to have the recommended bone scan performed.

Defendants also apply this reasoning to Velner's statement that on June 2, 1999, "staff at PCF recognize that Mr. Magbual's hand/finger was in need of emergent care by an orthopedic doctor" as well as the delay in referring Plaintiff to a specialist. Neither recognizing the need for immediate medical attention nor deciding to refer a patient are nurses' functions, according the Defendants. They assert that Velner's citing of an orthopedic medical textbook in both cases demonstrates that even she recognizes these failures are critiques of the doctors involved, and not the nurses.

Defendants further state that ordering anti-inflammatory medications, like ordering any other drug, can not be performed by nurses. They explain that nurses can not order occupational

therapy on the recommendation of an outside physician, nor make medical diagnoses. With respect to diagnoses, Defendants also state that if, as Velner says, the diagnoses kept changing, it would be impossible for them to render effective nursing care. Defendants also argue that the delay in surgery does not support a claim against them, because surgery is not in the nurses' control. Accordingly, they conclude that Velner's criticisms do not apply to them.

Defendants argue that while Velner's opinion might apply to the doctors, "it is entitled to no weight as an expert opinion because she does not have the education, training, or experience to critique the doctors." They also contend that "Nurse Velner's curriculum vitae does not include expertise in occupational therapy or as an orthopedic physician. Thus, she does not have the foundation to give her opinion that the cause of Plaintiff's contractures was the lack of occupational therapy."

Defendants state that both Velner and Warshawsky fail to provide an outline of the chain of causation between the alleged failures and Plaintiff's damages. Consequently, Defendants argue the affidavits are insufficient to avoid dismissal under Minn. Stat. § 145.682, subd. 6.

Plaintiff responds that the expert affidavits are sufficiently detailed under Minnesota law. He explains that the affidavits provide an analysis of the standard of care, the acts or omissions he alleges resulted in a violation of the standard of care, and a specific outline of the chain of causation. Consequently, Plaintiff argues the affidavits satisfy the requirements of Stroud.

Plaintiff states his argument as follows" [b]asically, Reynaldo Magbual complains that the healthcare providers who initially treated him, at the Prairie Correctional Facility, failed to properly diagnose or treat his worsening hand symptoms." Plaintiff states that paragraphs 45 and 51-57 provide causation. In addition, Plaintiff emphasizes that paragraph 57 includes local

doctors. Plaintiff notes that in Swierkiewicz v. Sorema, N.A., 534 U.S. 506 (2002), the Supreme Court determined that plaintiffs in an employment discrimination case are not required to plead facts to make a prima facie case in their initial complaints. Plaintiff also cites Ellefson v. Earnshaw, 499 N.W.2d 112 (N.D. 1993) in opposing the Defendants' motion for summary judgment. Plaintiff states that in Ellefson, the North Dakota Supreme Court interpreted a North Dakota statute and determined that "the statute does not require that the expert opinion be sufficient to sustain a directed verdict, or that the matter be tried in the context of the motion to dismiss the action under the statute." Plaintiff states the same analysis should apply in Minnesota. Alternatively, Plaintiff requests the opportunity to submit additional affidavit testimony if the Court finds the current affidavits are deficient.[6]

**2. Deprivation of constitutional and statutory rights.**

Defendants argue that the facts alleged by Plaintiff do not constitute an Eighth Amendment claim as a matter of law. They state that they were not deliberately indifferent to Plaintiff's needs. Defendants explain that Plaintiff was seen by an EMSA staff member immediately after his injury, in the following months he was seen on numerous occasions by the nursing and medical staff at PCF, and Plaintiff was referred to orthopedic specialists and ultimately a hand specialist. Defendants argue that this was all done in an attempt to alleviate his pain. While he argues the treatment was inadequate, Defendants contend that "Plaintiff's disagreement with the course of medical treatment by EMSA or Nurses James and Debuhr is not

[6]Plaintiff also makes the argument that if his affidavits are insufficient under Minn. Stat. § 145.682 in the present case, then the statute is unconstitutional. Because this argument is identical to the one offered in response to Defendants Viratyosin and Tatsumi's motion to dismiss, the Court will not restate it in this section of the Report and Recommendation.

sufficient to state an Eighth Amendment claim."

Defendants cite Camberos v. Branstad, 73 F.3d 174, 177 (8th Cir. 1995) and Logan v. Clarke, 119 F.3d 647, 649-50 (8th Cir. 1997) for the proposition that "delay alone does not amount to an Eighth Amendment violation." They conclude that, at most, Plaintiff's affidavits demonstrate a potential malpractice claim.

Plaintiff responds that he can assert a § 1983 action in the present case against Defendants.[7] He explains that the Supreme Court has held that deliberate indifference to the needs of prisoners constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. Plaintiff cites Reece v. Grose, 60 F.3d 487 (8th Cir. 1995), a case concerning prison officials' alleged delay of medical treatment, in support of his claim. He states that in Reece, the Eighth Circuit found that a question of fact existed, and the plaintiff had submitted sufficient evidence to go to trial.

With respect to the issue of state action, Plaintiff explains that in Segler, a court determined that a private healthcare provider that provided medical services to prisoners qualified as a state actor. In Richardson v. McKnight, 521 U.S. 399 (1997) the Supreme Court found prison guards employed by a private corporation contracted to manage a correctional facility were not entitled to qualified immunity from a § 1983 action. And in Krueger v. Jenne, 164 F. Supp.2d 1330 (S.D. Fla. 2000), a § 1983 actions against a private healthcare provider, the court held that delay in treatment constituted deliberate indifference subjecting the defendant to liability.

---

[7]When addressing this motion to dismiss, Plaintiff again does not make any arguments in support of his §§ 1985 and 1986 claims. Consequently, the Court assumes Plaintiff is also withdrawing these claims with respect to Defendants Debuhr, James, and EMSA.

Plaintiff explains that the pleadings and expert affidavits demonstrate Defendants were deliberately indifferent to his serious medical needs. In response to Defendants' argument that they were not deliberately indifferent, Plaintiff states "this is a determination to be made by the jury."

### 3. Negligent infliction of emotional distress.

Defendants argue that they did not place Plaintiff in a perilous position. Instead, Plaintiff was brought to them after the perilous situation had ended. Defendants argue that even if all the allegations of failure to provide adequate care were true, they still did not put Plaintiff in a position of immediate physical harm. Consequently, they contend that Plaintiff can not claim negligent infliction of emotional distress based on the "zone-of-danger."

Defendants also argue that Plaintiff has failed to establish that any of them engaged in willful, wanton, or malicious conduct. Consequently, they state that Plaintiff can not make a claim based on a direct invasion of his rights.

Plaintiff responds that "the Complaint indicates a number of circumstances where Plaintiff's deteriorating health condition was wantonly ignored by Defendants." He explains that after the initial injury, the nurses at PCF noted he suffered from decreased range of motion and swelling but EMSA Correctional Care did not refer him to a medical doctor until the following week, when his symptoms had worsened. Further, his request for approval of outside help was not sent to Hawaii until May 6, 1999. And during the intervening time, his fracture went undiagnosed. Finally, while the staff did recognize on June 2, 1999, that his hand and finger were in need of an orthopedic doctor's emergency care, he was not presented to such a doctor until June 25, 1999. Plaintiff concludes, "[t]hese, and other aspects of the Complaint clearly

show an allegation of conduct which comes under the rubric justifying a separate cause of action for negligent infliction of emotional distress under Minnesota law."

**E. <u>The Court's Recommendation.</u>**

**Defendants Viratyosin and Tatsumi.**

**1. Medical malpractice.**

The Court recommends granting Defendants' motion to dismiss the claims of medical malpractice. Warshawsky's affidavit complies with the general requirements of Minn. Stat. § 145.682, as well as the particular details specified in <u>Sorenson</u>. Warshawsky does more than state that Defendants failed to properly evaluate or diagnose. Paragraph 45 details how improper diagnosis and lack of therapy can lead to symptoms of swelling and infection, and ultimately to complications including boutonniere deformities. Paragraph 56 specifies that the correct diagnosis should have included that Plaintiff suffered a metacarpal fracture. It also explains how proper diagnosis could lead to reversing the injury. Paragraphs 60 and 61 effectively summarize paragraphs 45 and 56 and explain that adequate diagnosis and treatment would have prevented the need for amputation and much of the swelling.

But none of the facts listed in the Amended Complaint or repeated in Warshawsky's affidavit indicate that Defendants deviated from the standard of care owed to Plaintiff. Instead, Warshawsky's affidavit indicates that Defendants treated Plaintiff correctly. Warshawsky states that diagnosis of the fracture and proper splinting would have prevented Plaintiff's subsequent injuries. Viratyosin did not see Plaintiff until two months after the injury. Therefore, he can not be held responsible for failing to provide immediate care on the date of the injury. When Viratyosin did treat Plaintiff, he: (1) drained the abscess, (2) stated he could not rule out an

infection; (3) recommended a bone scan; and (4) recommended physical therapy. All of this behavior is consistent with Warshawsky's description of proper care. Viratyosin did not rule out infection, one of the potential complications from Plaintiff's injury. He recommended therapy which could have improved Plaintiff's condition, or alternatively, led to discovering the severity of his injury. And he recommended a bone scan. One of the purposes of a bone scan is to detect fractures. Had the bone scan been performed, Plaintiff's fracture could have been discovered much earlier. While PCF staff failed to implement his recommendations, that is not Viratyosin's fault.

The same is true for Tatsumi. In September 1999, he examined the hand and ordered Plaintiff to see a hand specialist because he had developed contractures (boutonniere deformity). Hence, Tatsumi correctly diagnosed Plaintiff and appropriately referred him to a hand specialist. The delay in providing the hand specialist was again PCF's fault rather than Tatsumi's. Consequently, dismissal is appropriate under both Federal Rule of Civil Procedure 56, and Minn. Stat. § 145.682, subd. 6.

The Court also can not accept Plaintiff's argument that if Warshawsky's affidavit fails to satisfy § 145.682, the statute is unconstitutional. Minnesota courts have previously considered this question and concluded that the statute is constitutional. See Henke v. Dunham, 450 N.W.2d 595, 598 (Minn. Ct. App. 1990), review denied (March 22, 1990) (holding that while no other Minnesota tort statute requires a similar affidavit, § 145.682 is rationally related to a legitimate state purpose, and, therefore, complies with equal protection ).

The Court also disagrees with Plaintiff's assertion that § 145.682 is unconstitutional on due process grounds. Defendant's counsel informed Plaintiff's counsel of the deficiencies in the

affidavit prior to filing their motion to dismiss. Hence, Plaintiff had reasonable notice prior to the June 3, 2002 hearing, that he lacked adequate facts and proof to support his malpractice claim. Further, the Court disagrees with the argument that § 145.682 unfairly reverses the burden which is normally applied to summary judgment motions. In the present case, viewing all of the facts in the light most favorable to Plaintiff, including the standard of care outlined in Warshawsky's affidavit, the Court must still conclude that Defendants did not deviate from that standard. Plaintiff has offered no facts to the contrary. Consequently, summary judgment would be appropriate regardless of § 145.682. Hence, applying the statute deprives Plaintiff of no opportunities he would otherwise have.

As a final note, the Court recommends denying Plaintiff's request for additional time to provide further affidavits. In Bellecourt, the court explained that,

> To claim excusable neglect, Minnesota courts require a plaintiff to satisfy four factors: (1) plaintiff has a reasonable case on the merits; (2) plaintiff has a reasonable excuse for his failure to meet the statutory time limits; (3) plaintiff has proceeded with due diligence after notice of statutory time limits; and (4) no substantial prejudice will result to defendant by the extension of time.

784 F. Supp at 636-37 (citations omitted). In the present case, the Court finds that Plaintiff does not have a reasonable case on the merits. As stated above, Plaintiff can not demonstrate that Defendants deviated at all from the standard of care owed to him. In addition, Plaintiff's counsel was informed of the affidavit's deficiencies prior to the filing of the present motion, but did nothing to cure the problem. Therefore, the Court finds Plaintiff can not satisfy the first three elements listed Bellecourt. As a result, there is not justification for extending the time limit.

**2. Deprivation of constitutional and statutory rights.**

The Court recommends granting Defendants' motion with respect to the § 1983 claim. In

many cases, determining whether a defendant acted with deliberate indifference to a plaintiff's illness or injuries is a question of fact, rendering summary judgment inappropriate. See e.g. Reece, 60 F.3d at 492. But in the present case, Plaintiff has failed to present facts indicating that Defendants even deviated from the applicable standard of care owed to him. As a result, the Court concludes as a matter of law that Defendants did not act with deliberate indifference to Plaintiff's injury. Therefore, the Court recommends granting summary judgment.

**3. Negligent infliction of emotional distress.**

The Court recommends granting Defendants' motion with respect to the negligent infliction of emotional distress claim. Plaintiff states that his claim is based on suffering a direct invasion of his rights as stated in the § 1983 action. To make out such a claim, Plaintiff must show behavior at the level of willful, wanton, or malicious conduct. See Lickteig, 556 N.W.2d at 560. As stated above, there is no evidence that Defendants deviated from the standard of care owed to Plaintiff. Consequently, they committed no § 1983 violation. Thus, Plaintiff can claim no direct violation of his rights, let alone wanton or malicious behavior. As a result, the Court recommends that Defendants' motion be granted with respect to this claim.

**Defendants Debuhr, James, and EMSA.**

**1. Medical malpractice.**

The Court recommends granting Defendants' motion for summary judgment on Plaintiff's medical malpractice claim. Defendants Debuhr and James correctly argue that all except one of the deviations from the appropriate standard of care that Velner identifies in her affidavit concern physicians' duties rather than nurses. Defendants concede that the initial failure to refer Plaintiff to a physician was their duty. But Velner does not explain the causal

relationship between this particular failure and Plaintiff's damages. The same is true of Warshawsky's affidavit. Warshawsky states that Plaintiff's injury required evaluation by an orthopedic specialist "on the same date." As stated earlier, he then goes on to explain the medical chain of events that can result from failing to provide the proper splinting therapy, and failing to diagnose a fracture. But Warshawsky does not explain how Debuhr and James' initial failure to refer Plaintiff contributed to this chain of events. Warshawsky does not state that because of the initial delay, the doctors who subsequently treated Plaintiff were unable to detect the fracture. Nor does Warshawsky state that the initial delay was so long that it made effective splinting therapy impossible. Consequently, Plaintiff has failed to outline the chain of causation from Debuhr and James' breach of the standard of care to Plaintiff's damages.

In addition, the facts surrounding the June 2, 1999 date do not indicate that Defendants Debuhr and James breached their duty of care to Plaintiff. Both Velner and Warshawsky note that "[o]n June 2, 1999, the staff at the Prairie Correctional Facility finally recognized that Mr. Magbual's hand was in need of emergent care by an orthopedic doctor, yet he was not seen by an orthopedic doctor until June 25, 1999." But Plaintiff does not explain how the PCF staff's delay applies to Debuhr and James. In addition, neither affidavit explains the causal relationship between this delay and the eventual need for amputation. As a result, Plaintiff has failed to satisfy Minn. Stat. § 145.682, and the claim should be dismissed. See Stroud, 556 N.W.2d at 555-56.

As a result of Plaintiff's failure to present sufficient evidence of causation, dismissal is also proper pursuant to Fed. R. Civ. P. 56. While the Court is bound to resolve all doubts in favor of the nonmoving party, courts have continually recognized that "'mere inferences,

conjecture, speculation or suspicion are insufficient to establish a material fact upon which to base the denial of summary judgment.' *Huggins v. Teamsters Local* 312, 585 F.Supp. 148, 150-51 (E.D.Pa.1984); 11 MOORE'S FED. PRAC. § 56.14[1][d] (1997)." Ferron v. West, 10 F. Supp.2d 1363, 1366 (S.D. Ga. 1998).

Once again, the Court also can not accept Plaintiff's argument that § 145.682 is unconstitutional. As stated above, Plaintiff's evidence of causation would be insufficient to survive summary judgment even without § 145.682. Consequently, the statute deprives him of no opportunity he would otherwise have. In addition, Minnesota courts have found that the statute complies with equal protection. See Henke, 450 N.W.2d at 598.

Finally, the Court once again recommends denying Plaintiff's request for additional time. As stated when addressing Defendants Viratyosin and Tatsumi's motion to dismiss, Plaintiff was informed of the affidavits' deficiencies prior to Defendants' filing of this motion, but did nothing to cure the problem. Therefore, he can not demonstrate excusable neglect. See Bellecourt 784 F. Supp. at 636-637.

**2. Deprivation of constitutional and statutory rights.**

The Court recommends granting Defendants' motion with respect to this claim. In the present case, Defendants concede the objective element of an Eighth Amendment claim is present. Namely, the harm was sufficiently serious. Hence, the question is whether Defendants were deliberately indifferent to Plaintiff's injury. "[D]eliberate indifference includes something more than negligence but less than actual intent to harm; it requires proof of a reckless disregard of the known risk." Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998) (citation omitted).

The Court concludes that there is insufficient evidence to present a genuine issue of

material fact concerning this element. Defendants' one identified breach of care was failing to refer Plaintiff to a physician for a week after his initial injury. The progress note from Plaintiff's initial visit on April 23, 1999 states that his hand was edematous and he was instructed to apply ice to his hand for the pain. The next note is from April 29, 1999, which records that Plaintiff continued to have pain and was scheduled to see a physician that afternoon. Hence, the evidence demonstrates that Defendants examined Plaintiff, recommended treatment, and then referred Plaintiff to a physician the day that treatment proved ineffective. In an Eighth Circuit case dealing with delays in treatment, summary judgment was granted on facts similar to the present case.

In Scherrer v. Stephens, 50 F.3d 496 (8th Cir. 1995), a prisoner alleged that prison officials unreasonably delayed in treating his broken finger. The court granted the defendants' motion for summary judgment, explaining as follows:

> Although delays occurred in Scherrer's initial examination by Dr. Thomas, and in executing Thomas's orders for x-rays and an orthopedic examination, we do not believe Scherrer submitted sufficient evidence that defendants ignored "an acute or escalating situation" or that the delays adversely affected his prognosis, given the type of injury in this case. *See Givens v. Jones*, 900 F.2d 1229, 1233 (8th Cir.1990); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir.1988) ("[p]hysicians are entitled to exercise their medical judgment"). While the course of treatment was conservative, Scherrer's allegations, do not rise to the level of deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 107, 97 S.Ct. 285, 292-93, 50 L.Ed.2d 251 (1976) (neither matters of medical judgment nor negligence is sufficient to maintain § 1983 action for deliberate indifference).
>
> We find Scherrer's desire for a replacement joint instead of fusion surgery is merely a disagreement with the course of medical treatment and does not state a constitutional claim. *See Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir.1990).

Id. at 496-97.

In the present case, Plaintiff's affidavits also do not establish that Debuhr and James' delays adversely affected his prognosis. As stated previously, the affidavits do not provide a causal relationship between Debuhr and James' delays and the ultimate need for amputation. Further, during the delay Debuhr and James were not simply ignoring Plaintiff's injury. They offered very conservative treatment and once this treatment proved ineffective, they referred Plaintiff to a physician. Even considering these facts in the light most favorable to Plaintiff, the Court concludes that they do not produce a genuine issue of material fact with respect to deliberate indifference.

The Court also finds the present facts distinguishable from those in which the Eighth Circuit has found certain delays in treatment sufficient to deny summary judgment on a § 1983 claim. In Miller v. Schoenen, 75 F.3d 1305 (8th Cir. 1996), a prisoner who had a received heart transplant alleged that the defendants failed to provide required treatment and failed to return him to the hospital when he suffered complications resulting from a subsequent surgery. In Miller, however, the plaintiff's condition was much more severe, and the required treatment had already been specified. Consequently, there was no justification for failing to provide the correct care. In the present case, however, Defendants were not neglecting to provide already prescribed care. Instead, they determined a conservative treatment and when it proved ineffective, they referred Plaintiff to someone more qualified. As a result, the Court recommends that Defendants' motion be granted as to the claim for deprivation of constitutional and statutory rights.

**3. Negligent infliction of emotional distress.**

The Court recommends granting Defendants' motion with respect to the negligent

infliction of emotional distress claim. To make out such a claim, Plaintiff must show behavior at the level of willful, wanton, or malicious conduct. See Lickteig, 556 N.W.2d at 560. The Court concludes that Plaintiff has not done so

Plaintiff bases his argument primarily on three events: (1) the initial delay in referring him to a treating physician; (2) the delay in taking an X-ray; and (3) the delay after the June 2, 1999 PCF note. Plaintiff states that these events demonstrate Defendants wantonly ignored his health conditions. As stated above, there is no evidence that the second and third delays were Debuhr and James' fault. They did not perform the X-ray, and there is no evidence that their conduct otherwise delayed that process. In addition, the June 2, 1999 note was taken by PCF staff, and there is no evidence indicating the nurses were involved. Finally, the initial delay in referring Plaintiff to a physician does not demonstrate wanton or malicious conduct. Debuhr and James treated Plaintiff's injury with ice initially. When it became clear that this treatment was insufficient, they referred Plaintiff to a physician on the same day. The Court concludes from these facts that there is no genuine issue of material fact concerning negligent infliction of emotional distress. Consequently, the Court recommends granting Defendants' motion with respect to this claim.

**4. Minn. Stat. § 256B.37.**

As a final note, all Defendants have noted that there is no private cause of action under Minn. Stat. § 256B.37. Plaintiff responded to this point by stating that the statute was not mentioned in the Amended Complaint. Nevertheless, Defendants explain that Plaintiff incorporates the statute from his original Complaint through paragraph 65 of the Amended Complaint. Given that Plaintiff states that he intended not to include this statute in the Amended

Complaint, and offers no argument in response to Defendants' request that it be dismissed, the Court recommends that this claim be dismissed.

Based upon the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

(1) Defendants Tatsumi and Viratyosin's Motion for Summary Judgment (Doc. No. 59) be **GRANTED**;

(2) Defendants Debuhr, James, and Emergency Medical Service's Motion for Summary Judgment (Doc. No. 76) be **GRANTED**.

Dated: November 4, 2002.

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by November 18, 2002, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.